IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| **TIMOTHY REDMOND, et al.,**<br><br>　　　　　　　　Plaintiffs,<br><br>vs.<br><br>**SCOTT CROWTHER, et al.,**<br><br>　　　　　　　　Defendants. | MEMORANDUM DECISION<br>AND ORDER<br><br>Case No.  2:13CV393DAK<br><br>Judge Dale A. Kimball |

　　　　This matter is before the court on Defendants' Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  The court held a hearing on the motion on May 18, 2014.  At the hearing, Plaintiffs were represented by Karra Porter and John Mejia, and Defendants were represented by Joni J. Jones and Kyle J. Kaiser.  The court has carefully considered the materials submitted by the parties, as well as the facts and law relevant to the motion.  Now being fully advised, the court renders the following Memorandum Decision and Order.

## BACKGROUND

　　　　This case arises from an incident on August 3, 2011, at the Olympus Facility at the Utah State Prison, in which prison guards used ochlorobenzylidenemalononitrile ("CS gas") against an inmate who refused to leave one of the recreation yards and return to his cell.  The guards released the CS gas grenade near two air vents which distributed the gas to several cell blocks within the Olympus Facility.  Plaintiffs are inmates who were in their cells at the time the CS gas

was released.  The Olympus Facility is a self-contained housing unit on the grounds of the Utah State Prison.  It houses medically fragile inmates, such as inmates requiring dialysis, and inmates with serious mental health issues.

Plaintiffs have asserted an Eighth Amendment excessive force claim against each Defendant, an Eighth Amendment medical neglect claim against Defendant Powell, and a claim under Article I, Section 9 of the Utah Constitution for a permanent injunction against each Defendant.  Defendant Jason Nicholes was a captain of the Special Operations Unit, and in charge of the incident with the hostile inmate.  Defendant Robert Powell was a captain assigned to the Olympus Facility and the head supervisor of the correctional staff on duty during the incident.  Defendant Scott Crowther is the warden of the Utah State Prison in Draper, Utah, and is sued in his official capacity for declaratory and injunctive relief only.

On the afternoon of August 3, 2011, an inmate at the Olympus Facility, James Hill, refused to return to his cell after violating prison policy by passing a container of cornflakes underneath another inmate's cell door.  He became agitated, aggressive, and confined himself to the "D Section" recreation yard.  The yard is open to the sky, with four walls surrounding it.

In the recreation yard, Hill began pacing, swearing, and yelling threats at security officers.  He pulled his glasses off and appeared to be sharpening them against the brick wall.  Hill threatened to "stick or cut the first pig" who entered the yard and also threatened to kill prison officers.

For over an hour, multiple prison officers and staff attempted to talk to Hill in an effort to calm him down and get him to return to his cell.  Two Crisis Intervention Team staff members and a therapist were sent to talk to him.  The officers also decided to leave him alone to give him a chance to cool down.

Pursuant to prison protocol when an inmate refuses to comply with orders and is not under control, the other inmates in the facility were required to return to their cells, which were then locked.  Also, because Hill refused to return to his cell or submit to any authority, the Special Operations Unit was requested.  The Special Operations Unit arrived at approximately 4:30 p.m.

Defendant Nicholes and the Special Operations Unit arrived at the Olympus Facility and analyzed the situation involving inmate Hill.  The team met in a room to consider options.  Nicholes and his team considered many different types of force and developed a plan to remove Hill from the yard.  Nicholes decided to use a CS gas canister to force Hill closer to them.  Once he was closer, they intended to use a taser on Hill to gain control of him.

When the team went to the recreation yard, Nicholes first tried using a show of force, which can sometimes be enough, but Hill did not respond.  Nicholes also gave Hill one last command to be cuffed and return to his cell.  However, Hill flipped him off.  Hill then used the CS gas grenade as the team had planned.

At 5:24, over an hour and fifteen minutes after inmate Hill had been in the recreation yard and threatening staff, the Special Operations Unit deployed the CS gas grenade in the yard.  When the CS gas grenade was deployed, some of the gas was sucked into the two air handlers located at the top of the "D Section" recreation yard.  The CS gas was distributed throughout the facility to housing units and administrative offices through the facility's HVAC system.  Plaintiffs' cells were fully enclosed with no open bars.  Some of the Plaintiffs believed that they were being gassed.  Many had irritated, watery eyes, and difficulty breathing.  Some kicked and screamed, while others placed towels or blankets over their heads.  Many also pressed their emergency call buttons that were located in their cells.

Defendant Powell realized there was a problem with CS gas entering the intake air units. Powell said, "Okay. This is going to get ugly folks. The one thing we didn't plan on is where is the intake air for this HVAC system. Right there, baby." Powell contacted the control room and confirmed that gas was entering some of the cells. He ran to the roof of the facility to turn off the air vents to keep the gas from going through the ventilation system. He then informed officers to go through the facility to check on the inmates.

Powell instructed officers and staff to evacuate Sections B and C of the Olympus Facility. The evacuated inmates were taken to a different recreation yard. At approximately 5:30, six minutes after the CS gas grenade was used, the staff began to air out the building and evacuate the inmates from Sections B and C. The control room and officers worked to get the cells unlocked and the inmates escorted to the other recreation yard. All of the prisoners in Sections B and C were fully evacuated by 5:46 p.m., sixteen minutes later.

A medical staff member came and walked down the line of inmates making contact with inmates and offering medical assistance. A few inmates were assisted in line and a few inmates went to the infirmary. Although some inmates were provided treatment, Plaintiffs allege that Powell discourage such treatment and referred to anyone needing medical assistance as a "sissy." The parties agree that Powell instructed the inmates not to seek treatment if their eyes were only stinging, that the inmates should only seek treatment if they thought their reaction was an emergency.

Plaintiffs take some issue as to whether the inmates were allowed to shower to help with the effects of the CS gas exposure. However, the evidence demonstrates that Plaintiffs Lassche, Watson, and Canfield were allowed to shower that evening. Plaintiff Monfort did not shower that evening, but he did not want to. Plaintiff Watson testified that "99 percent" of the affected

inmates showered. There is no evidence supporting Plaintiffs' assertion that the inmates were not allowed to shower.

Sections A and D were not as badly affected as Sections B and C and were not evacuated. Due to security classifications, inmates in Sections A and D are not allowed to be around other inmates. Thus, Sections A and D could not be evacuated at the same time as Sections B and C. They would have had to have been restrained and placed in a segregated area for the safety of staff and offenders. Officers went from cell to cell, opening cuff ports to help with ventilation and setting up industrial fans. One officer testified that while the officers were talking to the inmates in Section D, the inmates were not comfortable but they did not seem like they were in distress. Another officer noticed an inmate who looked a little fatigued and he took him to the nurse. After Sections B and C had been evacuated, Powell entered Sections A and D. He testified that the CS gas had dissipated and that inmates were no longer complaining of exposure. Medical staff also went around and checked on the welfare of the inmates.

After the incident, Defendant Nicholes and his team reviewed the video and took the location of the air vents into account for future planning and implemented various practices into their order of operations. They also reviewed the whole incident, the use of force, the deployment of weapons, and the hands on force. Defendant Powell reviewed the incident and concluded that the actions of prison staff were consistent with Utah Department of Corrections policy.

## EVIDENTIARY OBJECTIONS

Plaintiffs make evidentiary objections to Defendants' Olympus Chronological Shift Log and Incident Report as being irrelevant or inadmissable hearsay. The materials are clearly relevant. Plaintiffs may object to the shift log and incident report if the facts within the records

"cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Defendants need only explain an admissible form through which the records would be admissible. *Id.* Adv. Comm. Note.

The shift logs and incident report would be admissible at trial under the business records exception to hearsay. Fed. R. Evid. 803(6). The shift log and incident report meet all of the requirements for a business records exception. First, the shift log is a detailed log of events taken by Officer Eskelson as the events happened. The incident report is a record of the events signed by Officer St. Germain, an officer involved in the events, one day after the events in question. Thus, both were made at or near the time by someone with knowledge. Further, while under oath, both Officer Eskelson and Officer St. Germain acknowledged the records and stated that they were the respective authors. During their depositions, Plaintiffs had the opportunity to question both officers regarding the records' accuracy and the practice of keeping the records. Keeping and making records, such as the shift log and the incident report, is the regular course of business for the prison. Therefore, the records are admissible.

Plaintiffs also make evidentiary objections for lack of foundation to Plaintiffs' own statements under oath that the inmates received medical care following the exposure to the CS gas. Defendants have no burden to produce evidence substantiating the accuracy of Plaintiffs' sworn statements. Plaintiffs have failed to come forward with evidence contradicting their own sworn statements that inmates were offered medical services, those inmates requesting medical services were transferred to the infirmary, almost all of the inmates, but certainly the Plaintiffs who wanted to, were allowed to shower, and that by the time all the inmates were evacuated, the symptoms experienced by Plaintiffs and many of the inmates had subsided.

Plaitniffs also object to Nurse Gappmeyer's statement, "To [everyone's] surprise it went

6

to the intake vent," because Plaintiffs maintain that Nurse Gappmeyer lacked foundation to testify about others' states of mind. But Nurse Gappmeyer's statement was based on observations that could be made by a lay witness. Such testimony is allowed by Rule 701 of the Federal Rules of Evidence. "The prototypical example of the type of evidence contemplated by the adoption of Rule 701 relates to the appearance of persons . . . . [T]estimony that a person was 'excited' or 'angry' is more evocative and understandable than a long physcial description of the person's outward manifestations." *United States v. Denny*, 48 Fed. Appx. 732, 737-38 (10th Cir. 2002). Nurse Gappmeyer was present and perceived the surprise on the part of those near him when the gas was taken up into the air intake vents. Therefore, he is competent to testify about his own perceptions.

Furthermore, Plaintiffs object to Defendants' assertion that the prison staff who were not wearing gas masks were experiencing the same effects of CG gas that the inmates were experiencing. Plaintiffs contend that there is no foundation to say that the intensity of the officers' experience matched the intensity of the Plaintiffs' experiences. Defendants, however, assert that they do not claim that the officers experienced the same intensity level as the inmates. Defendants simply assert that the officers were experiencing the same objective effects from the CS gas–such as skin irritation, watery eyes, and coughing. The degree of intensity to which separate individuals feel the effects is subjective. However, there is sufficient foundation for Officers Eskelson, McClain, and Anderson to testify that they were not wearing gas masks, they experienced the objective effects of CS gas, and were able to complete their tasks.

Finally, Plaintiffs object to Defendants' assertion that Captain Powell, personally or by directing his staff, entered Section A and checked with medical or clinical staff to check on the inmates' well-being. Although Powell used language at one point in his deposition that he

"would have" required something, he also clearly testified that he entered section A and D with his staff and directed the medical personnel to check each inmate according to policy.

## DISCUSSION

### Defendants' Motion for Summary Judgment

**1. Qualified Immunity**

Plaintiffs seek damages from Defendants Powell and Nicholes in their individual capacities. However, Powell and Nicholes argue that Plaintiffs' claims against them should be dismissed because they are entitled to qualified immunity.

First, Defendants argue that no clearly established law could have alerted Defendants that their actions were unconstitutional. To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right." *Albright v. Rodriguez*, 51 F.3d 1531, 1535 (10th Cir. 1995). There are no Supreme Court or Tenth Circuit cases specifically holding that accidentally exposing inmates to CS gas while trying to restrain a resistant inmate is unconstitutional. Instead of identifying clearly established law, Plaintiffs argue that the law Defendants cited is distinguishable. But distinguishing case law declining to find an Eighth Amendment violation when an inmate is exposed to chemical dispersant used to control another inmate, does not meet the burden of showing clearly established law.

In addition, it is well settled that negligent conduct is not sufficient to show a violation of the Eight Amendment. To be cruel and unusual punishment, "conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). Whether "that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring

8

officer control over a tumultuous cellblock," it is "obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause." *Id.*

Consistent with *Whitley*, courts have held that accidental exposure to pepper spray or gas does not state a claim under the Eighth Amendment. In an inadvertent pepper spray case, the Tenth Circuit denied the inmate's Eighth Amendment deliberate indifference claim against prison officials because the inmate failed to allege that the defendants acted with a sufficiently culpable state of mind. *Gargan v. Gabriel*, 50 F. App'x. 920, 924 (10th Cir. 2002). The court stated that "[n]owhere does [plaintiff] state . . . the defendants deliberately exposed him to pepper spray." *Id.* Plaintiff alleged that following the second pepper spray incident, a nurse "remarked to him she should have removed him from the area prior to using the spray." *Id.* But the court found that "at most, this states a claim of negligence insufficient to constitute an Eighth Amendment violation." *Id.*

As one court explained, there is no "transferred intent" in Section 1983 actions: "Thus, when a correctional officer, in an attempt to restore order or compliance, sprays pepper spray into one inmate's cell and another inmate is inadvertently exposed to the spray, the second inmate does not have a claim for an Eighth Amendment violation based on excessive force." *Koon v. Dyson*, 2004 WL 3217870 (D.S.C. Sept. 30, 2004).

The evidence in this case is clear that the officers did not consider the air intake vents. Defendant Powell's statement on the video of the incident clearly demonstrates that there was no deliberate intention to expose the other inmates to the CS gas. The nurse who was present also testified that it surprised everyone that the gas went to the air intake vent. Moreover, the fact that the CS gas was distributed among the administrative areas of the facility shows that the gas

9

exposure to Plaintiffs was accidental.

Plaintiffs speculate that the whole incident was a training exercise, but there is no evidence supporting such speculation. The fact that the facility previously ordered gas masks does not demonstrate or suggest that the officers intended to expose any of the inmates except Hill. Plaintiffs' further point to a schedule listing training at the Fred House training academy on that day. However, the Fred House facility is nowhere near the Olympus facility and the fact that training was to occur at a separate training academy in no way suggests that the officers intended to conduct training on actual inmates. There is no evidence to suggest that Plaintiffs, who were in their cells, were the intended recipients of the gas. The evidence is clear that Defendants' failure to consider the air intake vents was a mistake and negligence at worst.

Because the law is clearly established that negligence is not sufficient to satisfy the subjective intent requirement of an Eighth Amendment claim, Defendants are entitled to qualified immunity. Accordingly, the court dismisses Plaintiffs' Eighth Amendment claims.

**2. Excessive Force**

Plaintiffs' Eighth Amendment claim for secondary exposure to CS gas must be analyzed as an excessive force claim, not a conditions of confinement claim. In *Despain v. Uphoff*, 264 F.3d 965 (10th Cir. 2001), the Tenth Circuit applied the excessive force standard when the officer used a dispersant on inmates. *Id.* at 978. The district court had analyzed the case as a conditions of confinement claim. But the Tenth Circuit reversed, explaining that "while it may be tempting to apply the *Farmer* test for conditions of confinement" because the pepper spray created a general condition that affected the prisoners' environment, pepper spray "is an instrument with which prison officers wield their authority, or force, and thus its use implicates the excessive use of force." *Id.*

The Ninth Circuit has held that a secondary exposure claim can succeed if the force used on the intended target is excessive. *See Clement v. Gomez*, 298 F.3d 898, 903 n.3 (9th Cir. 2002). The Ninth Circuit case law appears to be at odds with the Tenth Circuit. Moreover, the fact that the Ninth Circuit applies a different standard also demonstrates that there is no clearly established law on this point. Thus, qualified immunity would still be appropriate.

Nonetheless, the force used against Hill was not excessive. The officers used several means of intervention involving no force before using the CS gas. And, in the Olympus Facility, the situation needed to be dealt with so that other inmates could be allowed out of their cells. Other inmates are required to be in lock down when another inmate is uncontrolled. Thus, other inmates were missing doctor's appointments and otherwise adversely affected. It was not constitutionally unreasonable after more than an hour of using other means of intervention to employ the CS gas.

Plaintiffs incorrectly argue that CS gas was not necessary and unreasonable under the circumstances. But the Supreme Court has expressly rejected the unnecessary and unreasonable standards. Instead, the Supreme Court has emphasized that the question of whether force was unconstitutional turns on whether the force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the purpose of causing harm. The facts in this case do not show that using CS gas on Hill evinced wantonness so as to be malicious and sadistic. The use of CS gas is considered less force than other physical means of force because there are no lasting effects. Whereas other physical interventions could have resulted in permanent or more serious injuries.

Defendants were not required to wait out Hill or use other types of force. The fact that there could have been better approaches might show an error in judgment, but the *Whitley* court

found that insufficient. "At most, this [expert opinion] evidence . . . establishes that prison officials arguably erred in judgment when they decided on [their] plan . . . It falls far short of showing that there was no plausible basis for the officials' belief that this degree of force was necessary." 475 U.S. at 323.

Hill repeatedly refused to obey direct orders from prison officials. "Inmates cannot be permitted to decide which orders they will obey, and when they will obey them." *Soto v. Dickey*, 744 F.2d 1260, 1267 (7th Cir. 1984). Hill did not get to decide how long he got to stay in the recreation yard, and Defendants were not constitutionally required to wait it out. The Tenth Circuit has favorably cited to *Soto* for the principle that prison officials did not unjustifiably use excessive force against inmates when they used mace in response to a refusal to obey orders. *Hunter v. Young*, 238 Fed. Appx. 336, 339 (10th Cir. 2007). While after the fact evaluation of the use of force is valuable in helping officers to improve their practices, it does not show that the officers violated constitutional rights in the first instance.

The Tenth Circuit has clearly rejected the deliberate indifference standard in determining cases of excessive use of force. The facts surrounding a disturbance do not determine which standard should apply. The type of force determines the applicable standard. CS gas is an instrument with which prison officers wield their authority and force. Therefore, controlling Tenth Circuit law applies the *Whitley* standard. *Despain*, 264 F.3d at 978.

The Tenth Circuit has held that "where no penological purpose can be inferred from a prison employee's conduct . . . the conduct itself constitutes sufficient evidence that force was used maliciously and sadistically for the very purpose of causing harm." *Id*. This case is far from the case in which the Tenth Circuit has held that no legitimate penological purpose can be inferred. Here there was obvious penological interest in using tear gas on Hill after he escaped to

an outdoor recreation area, started sharpening his eyeglasses to use as a knife, stated he would stick the first pig who came in, refused to respond to officers' commands, responded with vulgarity and threats of violence, and kept up this behavior for over an hour. The CS gas was used to restore order, maintain discipline, and prevent Hill from harming himself or officers.

### 3. Deliberate Indifference to Medical Needs

Plaintiffs' Eighth Amendment medical neglect claim against Defendant Powell fails because Powell did not disregard the risk posed to Plaintiffs' health after they had accidentally been exposed to CS gas. He immediately tried to find out where the gas was going, went to the roof to turn off the intake vents, made officers check on each inmate, evacuated the lower security inmates in a timely manner, brought in fans for the higher security units, and had medical personnel make contact with each inmate.

There is no evidence that officials ignored the risk to inmates following the exposure of other inmates to CS gas. It is obvious from the video that prison officials were surprised by the gas going into the intake vents. Once Defendants were aware of the risk, they took many steps to alleviate the harm. There is no genuine material dispute that the inmates in Sections B and C were evacuated, provided medical attention, and allowed to shower.

Although Plaintiffs point to remarks Powell made discouraging Plaintiffs from seeking medical assistance, there is no evidence that anyone who needed medical assistance failed to receive it. Plaintiffs further argue that their group counselor shut down discussion of the incident too quickly and there were delays in getting one-on-one counseling sessions. However, these allegations do not rise to evidence that an official knew of and disregarded an excessive risk to the inmates health or safety.

**4. Utah Constitutional Claim**

Plaintiffs Utah Constitutional Claim under the Unnecessary Rigor Clause fails because Plaintiffs have not suffered any constitutional violation and their claims are redressable under Section 1983.  The Utah Supreme Court has acknowledged that there is no federal counterpart for the Unnecessary Rigor Clause in the Utah Constitution but that the court has had "few opportunities to interpret or apply" the clause.  *Dexter v. Bosko*, 2008 UT 29, ¶ 7, 184 P.3d 592, 595 (Utah 2008).  The Utah Supreme Court has held that the clause guarantees against "unnecessary abuse" of prisoners or arrestees that is "needlessly harsh, degrading, or dehumanizing."  *Id.*  "When a claim of unnecessary rigor arises from an injury, a constitutional violation is made out only when the act complained of presented substantial risk of serious injury for which there was no reasonable justification at the time."  *Id.* ¶¶ 16-17.  The Unnecessary Rigor Clause "applies where a prisoner shows that a prison employee was deliberately indifferent to the prisoner's medical needs or subjected him to clearly excessive or deficient or unjustified treatment.  *Id.*

Because Utah has no statutory cause of action for constitutional violations similar to 42 U.S.C. Section 1983, a cause of action for monetary damages only arises against a governmental agent for violation of the Utah constitution if (1) the provision alleged to be violated is "self-executing," (2) the plaintiff suffered a flagrant violation of rights, (3) existing remedies do not redress the plaintiff's injuries, and (4) equitable relief is inadequate to protect the plaintiff's rights or redress the plaintiff's injuries.  *Spackman v. Bd. of Educ.*, 2000 UT 87, ¶¶ 20-26.  The Utah Supreme Court urges caution in expanding new judicial remedies where existing remedies are sufficient, and gives deference to other remedies out of respect for separation of powers.  *Id.*

Plaintiffs' state law constitutional claims are barred because the existing remedy of

Section 1983 would redress their injuries. *Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

The Utah Supreme Court has defined the protections of the Unnecessary Rigor Clause in an identical way in medical treatment cases as the federal courts have defined protections of the Eighth Amendment. The Utah Supreme Court has stated that the Unnecessary Rigor Clause "applies where a prisoner shows that a prison employee was deliberately indifferent to the prisoner's medical needs or subjected him to clearly excessive or deficient or unjustified treatment." *State v. M.L.C.*, 933 P.2d 380, 385 (Utah 1997). The Tenth Circuit has used the same evidence to weigh Eighth Amendment and Unnecessary Rigor claims. *See, e.g., Childress v. Harms*, 449 F. App'x. 758, 759 (10th Cir. 2011) (unpublished).

It does not matter if the Unnecessary Rigor Clause and the Eight Amendment have different "contours," so long as a plaintiff's injuries may be redressed under Section 1983. *Cavanaugh v. Woods Cross City*, 2009 WL 4981591, at *6 & n.8 (D. Utah Dec. 19, 2009) (unpublished). Therefore, the court concludes that for the same reasons Plaintiffs' Eighth Amendment claims fail, Plaintiffs' state law claim fails as well.

**4. Injunction**

Finally, Plaintiffs maintain that they have a viable claim for injunctive relief because the prison's policies and procedures create an "objectively intolerable risk" that a similar situation may recur. But, risk is insufficient grounds for injunctive relief. To have standing to sue for injunctive relief, Plaintiffs must demonstrate that they are immediately in danger of sustaining some direct injury as a result of the challenged official conduct and that "the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *City of Los Angeles v.*

*Lyons*, 461 U.S. 95, 101-02 (1983).  A subjective apprehension that Defendant may not take steps to ensure inmate safety in future incidents is not enough for a permanent injunction.

Because the court has found that there was no constitutional violation and the same incident is not likely to occur in the future, Plaintiffs are not entitled to an injunction.  Prison officials have changed their practices and procedures relating to the implementation of CS gas.  Therefore, there is no cognizable danger that a similar incident will recur.

Moreover, Plaintiffs do not allege any particular UDOC policy is unconstitutional, but rather seek a permanent injunction ordering Defendants to adopt and comply with written policies regarding the deployment of chemical agents in the Olympus facility.  There must be some cognizable danger of a future incident.  Defendants have already taken reasonable steps to prevent a similar accidental exposure to CS gas in the future.  When using CS gas, the teams now must take the additional step of identifying the location of the HVAC system.  Therefore, the court finds no basis for entering the permanent injunction requested by Plaintiffs.

## CONCLUSION

Based on the above reasoning, Defendants' Motion for Summary Judgment is GRANTED.  Because this order disposes of all the claims at issue in the case, the Clerk of Court is directed to enter judgment in favor of Defendants and close the case.  Each party shall bear his own fees and costs.

DATED this 23rd day of June, 2016.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge